```
AG:GMP/SSS
#2010R00428/OCDETF #NY-NYE-637
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA

    - against -                                      COMPLAINT & AFFIDAVIT IN
                                                                        SUPPORT OF ARREST WARRANT

WELLINGTHON MAXIMO ALMONTE-MARTE,
RICARDO LOPEZ,                                                          (Title 21, U.S.C., § 846)
    also known as "Calvo," and
NELSON PICHARDO-REYES,
    also known as "El Doctor,"

    Defendants.
- - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        JAMAL HORNEDO, being duly sworn, deposes and says:

        On or about and between March 26, 2010 and August 11, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants WELLINGTHON MAXIMO ALMONTE-MARTE, RICARDO LOPEZ, also known as "Calvo," and NELSON PICHARDO-REYES, also known as "El Doctor," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved (a) one kilogram or more of a substance containing heroin, a Schedule I controlled substance, and (b) five kilograms or more of a substance containing

cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(A)(i)).

## I.  Qualifications and Sources of Information

1.  I, Jamal Hornedo, am a Special Agent with the Drug Enforcement Administration ("DEA").  I have been a DEA Special Agent for approximately ten years and am currently assigned to the New York DEA Field Office located in New York, New York.  As a Special Agent with the DEA, I am tasked with investigating narcotics trafficking, money laundering and other offenses.  During my tenure with the DEA, I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, and reviews and analyses of numerous taped conversations and records of drug traffickers.  Through my training, education and experience, which has included numerous instances of debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, conducting searches of locations where drugs and money have been found, and conducting surveillance of individuals engaged in drug trafficking, I have become familiar with the manner in which illegal drugs are imported and distributed in the United States, the method of payment for such drugs, and the efforts of

persons involved in such activity to avoid detection by law enforcement.

2. The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of the DEA and other law enforcement agencies and from review of various documents obtained by subpoena. In the portions of this affidavit that describe judicially authorized intercepted wire communications, virtually all of the information, unless otherwise indicated, is based upon my review of draft line sheets created by the monitoring DEA agents and persons acting under their supervision who intercepted the telephone call.[1] Furthermore, in the paragraphs below that describe surveillance within the United States, all surveillance was conducted by officers assigned to the New York Division of the DEA, including myself. The observations of

---

[1] In this Affidavit, I have described portions of certain telephone conversations that were intercepted during the course of court-authorized wire surveillance. I have not, however, summarized every pertinent intercepted call, nor have I included every pertinent part of the call that I have summarized. Moreover, any transcripts of intercepted calls are preliminary and in draft form. As such, the summaries set forth in this affidavit are preliminary in nature. My opinions concerning the meaning of coded or veiled conversations are based on my training and expertise developed as a result of investigating the distribution of controlled substances. The participants in the intercepted calls relied on in this affidavit spoke primarily in Spanish. For purposes of preparing this affidavit, your deponent relied upon draft English translations of the line sheets prepared by DEA translators, none of whom are certified interpreters.

the other involved law enforcement agents have been related to me to supplement the activities that I personally observed.

3.  Unless otherwise indicated, identifications of individuals on the wire intercepted communications in this investigation were made through name and voice identifications of the defendants made by the law enforcement agents monitoring the wire interceptions.  Agents initially identified each interceptee through the interceptee's identification of himself or herself by name during the course of the conversation in conjunction with available subscriber information.  Thereafter, agents would identify the interceptee through either the use of their name or voice identification based upon comparisons with prior interceptions of that individual.

4.  As set forth in the paragraphs below, there is probable cause to believe that the defendants are involved in the trafficking of narcotics, including cocaine and heroin.  Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth all facts known to me about this investigation and case.

**II.  Background**

5.  Since approximately October 2009, members of the New York Drug Enforcement Task Force ("NYDETF") Group T-22 have been investigating a narcotics trafficking organization that imports primarily cocaine from Mexico into the United States.  The investigation has revealed that the organization is capable of importing approximately 25 to 50 kilograms of cocaine to customers in New York and New Jersey on a monthly basis.  The drug trafficking organization uses a distribution network in New York, which is led by NELSON PICHARDO-REYES, also known as "El Doctor." The investigation has further revealed that defendant WELLINGTHON MAXIMO ALMONTE-MARTE distributes narcotics and collects money on behalf of the organization, and that RICARDO LOPEZ, also known as "Calvo" distributes narcotics on behalf of the organization.

**III. Court-Authorized Interceptions**

6.   Since March 26, 2010, and over the past several months, DEA New York received judicial authorization to conduct a wire tap on the various phones used by PICHARDO-REYES.  DEA agents began intercepting communications over the telephone of PICHARDO-REYES in late March 2010, and continued through early August 2010. During this period, DEA agents intercepted communications between PICHARDO-REYES, ALMONTE-MARTE and LOPEZ regarding drug trafficking activity.

7.  During the course of the investigation, the following telephones, being used by the defendants as set forth below, were intercepted pursuant to court-ordered interceptions: (a) On March 26, 2010, the Honorable Eric N. Vitaliano authorized interception of wire communications over a 30-day period over SPRINT/NEXTEL 718-637-0303, used by defendant NELSON PICHARDO-REYES ("0303 Telephone"); (b) On May 27, 2010, the Honorable Eric N. Vitaliano authorized interception of wire communications over a 30-day period over SPRINT/NEXTEL 954-347-5130, used by defendant NELSON PICHARDO-REYES ("5130 Phone"); and (c) On July 13, 2010, the Honorable Eric N. Vitaliano authorized interception of wire communications over a 30-day period over SPRINT NEXTEL 347-408-3621 used by defendant NELSON PICHARDO-REYES ("3621 Phone").

## IV.  Seizure of 19 Kilograms of Cocaine

8.  On or about April 14, 2010, PICHARDO-REYES called Robin Ogando, an associate of the drug trafficking organization,[2] using the 0303 Phone. In that conversation, PICHARDO-REYES asked, "Are you working right now?" Ogando replied, "Yes, Maestro. I am . . . but I have . . . what did you want?  I have an hour available." PICHARDO-REYES stated, "No. I wanted to see you in the white van/truck." Ogando stated, "Oh. We have to wait until

---

[2]  Ogando was charged with, and plead guilty to criminal possession of a controlled substance in the First Degree in New York County in or about November 2010. He was sentenced to eleven and a half years' incarceration in relation to the offense described below in or about November 2010.

after 4 p.m. Maestro because the Viejo's lady uses it to go to work and she gets out at 4:30 . . . so I can do the change with her when I get out because she and I work close to each other." PICHARDO-REYES asked, "Can it be done before that?" Ogando replied, "No, because she works in a hospital. You had to let me know last night and I would have done the change last night. But it can't be done fast like that." Based on my training, experience and the investigation thus far, I believe that, in this conversation, PICHARDO-REYES asked Ogando to use a white van to pick up the 19 kilograms of cocaine. Ogando explained that he could not get the white van until after 4:30 because his mother, the owner of the van, uses it to get to work. Ogando further explained that PICHARDO-REYES should have let him know the night before so that he could have traded vehicles with his mother to use the white van.

9. On or about April 14, 2010, at approximately 4:37 p.m., Ogando called PICHARDO-REYES on the 0303 Phone. In that conversation, Ogando asked, "Where do I see you, Maestro?" PICHARDO-REYES replied, I am here at Webster and 195." Ogando stated, "I will pass by there now." Approximately 20 minutes later, Ogando called PICHARDO-REYES. In that conversation, Ogando stated, "did you say 95 Maestro?" PICHARDO-REYES replied, "195 and Webster." Ogando stated, "I am here Maestro where they wash [i.e., a car wash]." Based on my training, experience and the investigation thus far, I believe that, in these conversations,

-7-

Ogando and PICHARDO-REYES were communicating regarding where PICHARDO-REYES was located, which is where they intended to meet regarding setting up a narcotics transaction.

10. On or about April 14, 2010, just prior to the time Ogando and PICHARDO-REYES had placed these series of telephone calls, I, along with other DEA agents conducted surveillance of PICHARDO-REYES. At approximately 7:00 p.m. that evening, DEA agents observed a white mini-van parked on Webster Avenue, near 195th street. DEA Agents further observed Ogando exit the driver's side of the white mini-van.

11. DEA agents then observed Ogando returned to the white mini-van approximately 15 minutes later. Subsequent to Ogando returning to the white mini-van, DEA agents established a mobile surveillance of Ogando's white mini-van. During the course of the agents' mobile surveillance, agents observed a blue Toyota Corolla, driven by ALMONTE-MARTE, with PICHARDO-REYES as the front passenger, following the white mini-van. The white mini-van and the blue Toyota Corolla crossed from New York City into New Jersey.

12. At approximately 8:40 p.m., I observed Ogando park the white mini-van near a warehouse facility located on Costco Drive in Cranberry, New Jersey. I also observed the blue Toyota Corolla driving around the area where the white mini-van had parked. Approximately 20 minutes later, DEA agents observed the

white mini-van exit the vicinity of Costco Drive and travel toward Interstate 95 towards New York City.

13.  On or about April 14, 2010, at approximately 9:55 p.m., Ogando called PICHARDO-REYES on the 0303 Phone.  In that conversation, PICHARDO-REYES asked, "Ok, you know the way to go to 'the curtain,' straight through here and then you come out there like on that curb there where you pump gasoline.  Right there."  Ogando replied, "Maestro, I had to stop.  I have a car following me and he is after me.  I stopped here because I cut him off, I got out and I stopped . . . and he is in front of me . . . that car was also following you guys as well."  PICHARDO-REYES asked, "But the car stopped in front of you?"  Ogando responded, "Yes.  Waiting for me to take off again."  PICHARDO-REYES asked, "Where did that car come from?"  Ogando stated, "From the highway . . . he was following me from over there and then he followed you guys."  PICHARDO-REYES asked, "How is it, Maestro?"  Ogando replied, "When you guys were about to pay the toll.  Did you guys see a green car, with dark tints?  A Dodge?"  PICHARDO-REYES stated, "Yes, we saw it . . . but nothing . . . fix what you were going to fix there, and were you able to put them where it goes at?"  Ogando stated, "No, Maestro.  This doesn't want to work, Maestro."  PICHARDO-REYES, exclaimed, "Damn!  That's a big fault on your part."  Ogando replied, "Maestro, what quantity is it?  To see if everything can be 'fixed' there."  PICHARDO-REYES stated, "It's not that much,

according to what you told me, it can be done there." Ogando stated, "What should I do, Maestro? I think they will turn around." PICHARDO-REYES asked, "Did they turn around?" Ogando stated, "I'm saying, I don't know. I don't see them anymore." PICHARDO-REYES stated, "Listen to what I'll tell you. Take off! Leave just like that. Nothing will happen to you now. You know how we are . . . move forward to where I told you to." Based on my training, experience and the investigation thus far, I believe that, in this conversation, Ogando was expressing concern that his white mini-van and PICHARDO-REYES's car were being followed by law enforcement. Specifically, he was concerned that a green Dodge with tinted windows was following them. This is corroborated by the fact that I observed Ogando conduct what appeared to be a series of counter-surveillance maneuvers to determine whether someone was following him. I further believe that, in this conversation, Ogando then asked about how much cocaine had just picked up and whether the cocaine could be re-positioned in the vehicle to better conceal it ("fixed") at the location where they were taking it. PICHARDO-REYES assured Ogando that it would be possible to better conceal the cocaine once they crossed back into New York ("it can be done there"). PICHARDO-REYES also reassured Ogando that everything would be alright and that he should continue driving the place where PICHARDO-REYES had instructed him to go

("Nothing will happen to you now.  You know how we are . . . move forward to where I told you to.").

14.  Subsequent to this telephone call, Port Authority Police performed a vehicle stop of the white mini-van that Ogando was driving on the George Washington Bridge as he was crossing from New Jersey into New York.  Upon being stopped by the Port Authority Police, Ogando consented to a search of his white mini-van.  During the course of the search, agents found and seized bricks of cocaine totaling 19 kilograms.  Law enforcement officers then arrested Ogando.

V.   **Summary of Other Selected Interceptions**

15.  Over the course of the wire tap investigation, DEA agents intercepted conversations between PICHARDO-REYES, ALMONTE-MARTE and LOPEZ, during which they conducted other narcotics transactions.  For example, on or about March 27, 2010, ALMONTE-MARTE placed a telephone call to PICHARDO-REYES on the 0303 Phone.  In that conversation, ALMONTE-MARTE stated, "J wants a whole one and I only have 600.  So, I called the man to complete it.  To see J later on but I am not waiting until 11:00 p.m.  Otherwise, I'll tell him to leave it until tomorrow.  He has money because I do it in his house."  PICHARDO-REYES stated, "It is quarter to 11."  ALMONTE-MARTE stated, "I'll do it tomorrow, then."  PICHARDO-REYES stated, "I am home, I'll see you tomorrow."  ALMONTE-MARTE responded, "I heard that it is positive."  PICHARDO-REYES asked,

-11-

"Did you do the rice pudding?" ALMONTE-MARTE responded, "I'll do it early, I have things ready." Based on my training, experience and the investigation thus far, I believe that during this call, defendant ALMONTE-MARTE told PICHARDO-REYES that his customer, J, wanted a whole kilogram of cocaine or heroin, but ALMONTE-MARTE only had 600 grams, and so he called their supplier to get the rest of the kilogram. ALMONTE-MARTE then stated that he did not want to wait until 11:00 p.m. for the cocaine. PICHARDO-REYES noted that it was almost 11:00 p.m. ALMONTE-MARTE decided that he would do it the next day. PICHARDO-REYES also asked if ALMONTE-MARTE had prepared the drugs for pick up by the customer ("Did you do the rice pudding?").

16. On or about April 12, 2010, LOPEZ placed a call to PICHARDO-REYES on the 0303 Phone. In that conversation, Calvo asked, "Can you find out about 'Pedrito' over there, the one with the same name as mine?" PICHARDO-REYES stated, "Uh-huh!" Calvo replied, "Yes, that he is available, so I want to know how we can do it. I want to know the address." PICHARDO-REYES stated, "Okay, I am going to find out. Let me call the nephew." Calvo stated, "At how much it can be done. Call him and call me back." PICHARDO-REYES replied, "Okay." Based on my training, experience and the investigation thus far, I believe that, in this conversation, LOPEZ asked PICHARDO-REYES if he could find out whether or not he could get some cocaine ("Pedrito"). LOPEZ

further stated that he wanted to know the details of arranging a cocaine transaction ("I want to know how we can do it") and where he could do it ("I want to know the address").  PICHARDO-REYES responded that he would call and find out the information.  LOPEZ further asked about the price terms for the transaction ("At how much it can be done") and told PICHARDO-REYES to call him back.

17.  On or about April 12, 2010, PICHARDO-REYES placed a call on the 0303 Phone to LOPEZ.  In that conversation, PICHARDO-REYES stated, "The nephew told me that it would be between two-fifty."  LOPEZ responded, "Uh-huh!  With the two up front?"  PICHARDO-REYES stated, "Uh-huh! With the three and the two-fifty."  LOPEZ asked, "Over there?"  PICHARDO-REYES responded, "Uh-huh!"  LOPEZ stated, All right.  Let me check on that and I will call you back."  Based on my training, experience and the investigation thus far, I believe that, in this conversation, LOPEZ and PICHARDO-REYES were discussing the price of cocaine, and PICHARDO-REYES said that it will be $32,500 per kilogram ("with the three and the two-fifty"), which was the going rate of cocaine at the time.  This call was a follow-up to the previous call in which LOPEZ inquired as to the price of the cocaine ("Pedrito").

18.  On or about April 12, 2010, LOPEZ placed another call to PICHARDO-REYES on the 0303 Phone.  In that conversation, LOPEZ asked, "Where are you?  I want to get 'a key' for someone."  PICHARDO-REYES stated, "I am here at the Pirate's hide out."  LOPEZ

stated, "I am going to go there so you could give it to me." PICHARDO-REYES replied, "Alright." Based on my training, experience and the investigation thus far, I believe that, in this conversation, LOPEZ inquired about PICHARDO-REYES's location because he wanted to meet him to obtain a sample ("a key") for one of his customers. LOPEZ told PICHARDO-REYES that he was going to meet PICHARDO-REYES to obtain it from him ("I am going to go there so you could give it to me."). Subsequent to this telephone call, DEA agents observed ALMONTE-MARTE meet with LOPEZ in the Bronx, New York. After this meeting, DEA agents followed LOPEZ to another location in the Bronx, where LOPEZ met an individual who met LOPEZ outside of LOPEZ's vehicle. After this meeting, the individual returned to an alley way nearby. DEA agents next observed LOPEZ drive from the Bronx to Brooklyn, where he appeared to conduct counter-surveillance. Specifically, he stopped at a corner near Manhattan Avenue, and then circled the block and returned to the same corner. Later that same day, agents intercepted a telephone call between PICHARDO-REYES and ALMONTE-MARTE. In that conversation, PICHARDO-REYES stated that LOPEZ saw vehicles, which LOPEZ believed to be driven by law enforcement, trailing LOPEZ's vehicle. PICHARDO-REYES stated that LOPEZ told PICHARDO-REYES that he then threw away his cellular telephone. PICHARDO-REYES then instructed ALMONTE-MARTE to change his telephone as well.

19. On or about July 16, 2010, ALMONTE-MARTE placed a telephone call to PICHARDO-REYES on the 3621 Phone, during which the following conversation took place: ALMONTE-MARTE asked, "Where are you, home?" PICHARDO-REYES answered, "More or less." ALMONTE-MARTE stated, "Pass by my house and bring me 100 pesos." PICHARDO-REYES asked, "Are you on foot?" ALMONTE-MARTE stated, "I'm not on foot but you know how it is. What did you tell me that in the car . . . ." PICHARDO-REYES stated, "No, I know but why don't you over here?" ALMONTE-MARTE replied, "Because they are going to come here and check it, it's . . . he's coming here with his people." Based on my training, experience and the investigation thus far, I believe that, in this conversation, ALMONTE-MARTE asked PICHARDO-REYES to bring 100 grams of narcotics (either cocaine or heroin) to his house. They then discussed whether ALMONTE-MARTE should come to PICHARDO-REYES, or PICHARDO-REYES would come to ALMONTE-MARTE to give ALMONTE-MARTE the narcotics. ALMONTE-MARTE then explained that the individual who was going to buy the narcotics was coming with his associates to ALMONTE-MARTE's house to check the quality of the narcotics.

20. On or about July 30, 2010, ALMONTE-MARTE called PICHARDO-REYES on the 3621 Phone. In that conversation, PICHARDO-REYES stated, "Ask this guy to see how much is Martinez number . . . a whole one." ALMONTE-MARTE asked, "The number?" PICHARDO-REYES responded, "Pedro Martinez, a whole one. And call me." ALMONTE-

MARTE stated, "Yes."  Based on my training, experience and the investigation thus far, I believe that, during this call, PICHARDO-REYES told ALMONTE-MARTE to ask his supplier what a whole kilogram ("a whole one") of cocaine ("Pedro") would cost ("see how much"). PICHARDO-REYES told ALMONTE-MARTE to call him when he found out from the supplier how much a whole kilogram cost ("Pedro Martinez, a whole one.  And call me.").

Wherefore, it is respectfully requested that defendants WELLINGTHON MAXIMO ALMONTE-MARTE, RICARDO LOPEZ, also known as "Calvo," and NELSON PICHARDO-REYES, also known as "El Doctor," be dealt with according to law.

_____
Jamal Hornedo
Special Agent
Drug Enforcement Administration

Sworn to before me this
⎯ day of December, 2010

_____
HON. ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK